# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **v.** | } | |
| | } | |
| **CRISTIAN RAMOS** | } | **Case No.: 3:23-cr-00135-MHH-** |
| **CONTRERAS,** | } | **HNJ-2** |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Cristian Ramos Contreras has asked the Court to suppress statements and evidence obtained by law enforcement officers following his arrest on April 5, 2023.  (Doc. 82).  After conducting an evidentiary hearing concerning Mr. Contreras's motion, (Doc. 93), Magistrate Judge Johnson entered a report in which he recommended that the Court grant in part and deny in part Mr. Contreras's motion to suppress.   (Doc. 105).   Judge Johnson found that following Mr. Contreras's arrest, the two agents who interviewed him violated his right to counsel because the agents continued to interrogate him after he unambiguously invoked his right to counsel.  (Doc. 105, pp. 15–24).  The magistrate judge found that the agents, "SA Morris and SA Bowlin[,] engaged in repeated interrogation of [Mr. Contreras] in contravention of *Edwards,"* (Doc. 105, p. 20) (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)); "engaged in impermissible communication aimed at garnering

Ramos Contreras's cooperation," (Doc. 105, p. 22); and, after Mr. Contreras invoked his right to counsel, asked Mr. Contreras for "the passcode to his phone," (Doc. 135, pp. 23–24). Judge Johnson recommended the "suppression of *all* incriminating statements post-invocation and their fruits," including the passcode to Mr. Contreras's cell phone and "the cell phone's contents to the extent the contents constitute fruits of the *Edwards* violation vis-a-vis the revelation of the passcode." (Doc. 105, pp. 24, 68 (italics in Doc. 105); *see generally* Doc. 105, pp. 24–68). Judge Johnson found that Mr. Contreras gave the officers "knowing and voluntary consent" to search his phone and concluded that the inevitable discovery doctrine makes the contents of Mr. Contreras's cellphone admissible despite the *Edwards* violation. (Doc. 105, pp. 71–94).

The United States did not file written objections to the report; Mr. Contreras did. (Doc. 106). Mr. Contreras objects to Judge Johnson's findings that he voluntarily consented to the search of his cell phone, that the retention and forensic search of his phone did not exceed the scope of consent, and that the inevitable discovery doctrine applies to the information obtained from him and his phone following the government's violation of his Fifth Amendment rights. (Doc. 106).

To address Mr. Contreras's objections, the Court held a supplemental evidentiary hearing and received additional testimony from Agent Morris and Mr. Contreras. (Doc. 136). The Court has reviewed the testimony from the hearing

before Judge Johnson and the exhibits from that hearing. (Docs. 93, 128, 129). This opinion resolves Mr. Contreras's objections to Judge Johnson's report. The opinion begins with a summary of the standards that govern a district court's consideration of objections to a magistrate judge's report. Next, the opinion summarizes the evidence established through the evidentiary hearings. Finally, the Court examines the evidence under the legal standards that govern the search of Mr. Contreras's phone.

## I.

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district judge must "make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge must consider *de novo* any objection to the magistrate judge's recommendation."). A district court's obligation to "'make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made'" requires a district judge to "'give fresh consideration to those issues to which specific objection has been made by a party.'" *United States v. Raddatz*, 447 U.S. 667, 673, 675 (1980) (italics in *Raddatz*) (first quoting § 636(b)(1); and then quoting H.R. REP. NO. 94-1609, at 3 (1976)).

To review *de novo* the factual and credibility findings to which Mr. Contreras objects, the Court had to hear the parties' evidence. *See United States v. Watkins*, 13 F.4th 1202 (11th Cir. 2021). In *Watkins*, the Eleventh Circuit explained:

> If the district court does not hold an evidentiary hearing itself it is bound to accept the fact findings of the magistrate judge, and the testimony of the law enforcement witnesses, all of whom the magistrate judge found to be fully credible.

*Watkins*, 13 F.4th at 1216. When a district court "conduct[s] another evidentiary hearing, it should make credibility decisions, enter fact findings of its own, and rule on the motion to suppress based on those findings." *Watkins*, 13 F.4th at 1216. Consistent with this standard, the Court conducted an evidentiary hearing, (Doc. 136), and the Court will enter its own findings of fact and make credibility decisions to enable the Court to rule on the motion to suppress. The Court will note in its fact findings inconsistencies between the evidence in the first evidentiary hearing and the second.

## II.

Mr. Contreras does not object to Judge Johnson's description of the events that led to his arrest. Judge Johnson found:

> On March 24, 2023, DEA agents in Laredo, Texas, intercepted 9.5 kilograms of heroin concealed within two industrial ovens. (DX4 at 1;

4

Doc. 83 at 1-2). Trucking company YRC Freight had arranged to ship the ovens to Birmingham, Alabama. (*Id.*).[1]

In early April 2023, Laredo and Birmingham DEA agents planned a controlled delivery of the ovens. (Doc. 83 at 2; doc. 93 at 8).[2] Specifically, agents replaced the heroin with a sham substance "intended to be a replica of the actual bundles of narcotics" and delivered the ovens to the DEA's Birmingham district office. (DX4 at 2; *see also* doc. 93 at 8-9). "Once the ovens were transported to the Birmingham DO, the ovens were placed on a wooden pallet and wrapped as if they were transported via YRC Freight." (DX4 at 2).

The ovens arrived at the Birmingham YRC Freight facility on April 4, 2023. (Doc. 83 at 2; DX4 at 2). At 9:15 a.m., YRC Freight personnel contacted the phone number listed on the bill of lading. (*Id.*). An unknown male answered the phone, remarked "I don't know" several times in Spanish, and hung up. (*Id.*). On April 5, YRC Freight personnel reached another unknown individual via telephone and advised the ovens were available for pickup. (*Id.*).

In the early afternoon of April 5, 2023, co-defendant Mario Carroza Ramirez arrived at the YRC Freight facility in a Chevrolet Silverado to collect the ovens. (Doc. 83 at 2; DX4 at 2-3). He presented false Mexican identification. (DX4 at 3). Ramirez loaded the ovens onto the bed of his truck. (Doc. 83 at 2; DX4 at 3). Thereafter, law enforcement surveilled Ramirez's truck and followed it north on Highway 79. (Doc. 83 at 2-3; DX4 at 3; doc. 93 at 9-10). Ramirez parked his vehicle at a restaurant, entered the building, and returned to his vehicle several times. (Doc. 83 at 3; DX4 at 3).

Later, a Nissan Pathfinder driven by co-defendant Abelardo Ramos-Telles entered the restaurant's parking lot. (*Id.*). Defendant Ramos Contreras sat in the passenger seat of the Pathfinder. (*Id.*). Ramirez approached the Pathfinder and spoke to Ramos-Telles and Ramos Contreras through the driver's side window. (*Id.*). Ramirez then

---

[1] *See also* Doc. 136, pp. 7–8.  DX4 was omitted from the record of the evidentiary hearing before Judge Johnson.  (*See* Doc. 128).  With the parties' consent, the Court has added DX4 to the docket sheet for this case, (Doc. 140; Doc. 140-1).

[2] *See also* Doc. 136, p. 8.

returned to his truck, and both vehicles drove in tandem towards Highway 65. (*Id.*). The defendants travelled north along Highway 65, stopped at a gas station in Cullman, Alabama, and travelled west along Highway 157. (*Id.*). The defendants stopped on two more occasions at a gas station and a liquor store, respectively, in the Muscle Shoals, Alabama, area. (Doc. 83 at 3; DX4 at 4).

At 5:45 p.m., the vehicles arrived at a residence in Sheffield, Alabama. (*Id.*; doc. 93 at 10). Ramirez, Ramos-Telles, and Ramos Contreras unloaded the ovens from Ramirez's vehicle and placed them in an outhouse on the property. (*Id.*). "Within minutes of unloading the package into the outbuilding, the truck was moved to the front of the home and all three individuals stood outside of the residence at the back of the truck." (DX4 at 4). Shortly thereafter, DEA agents approached the defendants, took them into formal custody, and placed them in separate vehicles. (*Id.*; doc. 93 at 10, 22).[3] Ramirez gave verbal and written consent to search the home. (DX4 at 4). One of the agents guided a canine in a free air sniff of the ovens, and it alerted to the presence of narcotics. (*Id.*).[4]

---

[3] During the July 29, 2025, hearing in this matter, DEA Special Agent Julian Morris, the case agent, indicated that the agents placed Mr. Contreras and another defendant in separate vehicles, and the DEA secured a third defendant inside the home. (Doc. 136, pp. 6–7, 22). For purposes of this opinion, the separation of the defendants is significant to the pressure each defendant may have felt to cooperate with the law enforcement officials who were attempting to examine them at the scene of the arrest.

In the April 7, 2023, report that SA Morris completed concerning the incident involving Mr. Contreras, SA Morris wrote that as the individuals stood at the back of the truck, "agents approached [them] and arrested them without incident." (Doc. 140-1, p. 4, ¶ 16). From the report, it appears that there were at least three DEA special agents, one task force officer, and one Homeland Security officer at the scene of the arrest. (Doc. 140-1, p. 4, ¶¶ 13–18).

[4] The heroin had been removed from the ovens and the ovens wrapped for transport at least two days before the canine searched the ovens. (Doc. 105, p. 4). During the July 2025, evidentiary hearing, the Court asked SA Morris how the canine alerted to the presence of narcotics if the agents had removed the heroin from the ovens. (Doc. 136, p. 23). SA Morris stated that he was not an expert on the issue, but he "know[s] if narcotics were present within a vehicle or wherever the dog is sniffing, it can still alert." (Doc. 136, p. 23).

> Officers commenced interviewing the suspects. SA Morris testified "no more than 30 minutes" transpired between the initial encounter and the interviews. (Doc. 93 at 22).

(Doc. 105, pp. 4–6).

Per SA Morris's testimony at the 2025 evidentiary hearing, the agents "immediately" placed all three suspects in handcuffs at the truck that had carried the ovens and then separated the suspects for questioning. (Doc. 136, pp. 22–23). SA Morris walked Mr. Contreras to his (SA Morris's) unmarked vehicle and sat Mr. Contreras in the passenger seat of the vehicle. (Doc. 93, p. 22; Doc. 136, pp. 12, 21–23). Mr. Contreras's hands were cuffed in front of him. (Doc. 136, pp. 12, 21). Another agent, Homeland Security Investigations Agent Justin Bowlin, sat in the back seat of Agent Morris's car between SA Morris and Mr. Contreras. (Doc. 128-1, p. 1; Doc. 136, p. 21). The car did not have a screen between the front and back row, (Doc. 136, pp. 21–22), so Agent Bowlin was visible and within arms' reach of Mr. Contreras. Neither SA Morris nor Agent Bowlin held a weapon. (Doc. 136, p. 11). SA Morris observed that Mr. Contreras was sweating and behaving as though he was nervous. (Doc. 93, pp. 53–54; Doc. 136, pp. 19, 23).[5]

---

[5] On direct examination during the July 2025 hearing, SA Morris testified that Mr. Contreras did not appear to him or to Agent Bowlin to be frightened. (Doc. 136, p. 11). When the Court examined SA Morris, SA Morris acknowledged that Mr. Contreras was sweating and behaving as though he was nervous. (Doc. 136, p. 23). The Court considers this and other inconsistencies in SA Morris's testimony and documentation of his interview with Mr. Contreras in determining the credibility of SA Morris's testimony and prior written statements. With respect to credibility, the Court also considers SA Morris's failure to record the first 15 minutes of his interview with Mr. Contreras.

SA Morris uses an application on his cell phone to record interviews with arrestees, (Doc. 136, p. 27), but SA Morris did not open the app to begin recording before he began questioning Mr. Contreras, (Doc. 136, p. 10). SA Morris asked Mr. Contreras if he knew why he was with the agents. (Doc. 93, p. 22). Mr. Contreras stated that he did not know what was going on. (Doc. 136, p. 25; *see also* Doc. 93, p. 23). Agent Bowlin read Mr. Contreras his *Miranda* rights in Spanish. (Doc. 136, pp. 9, 23; *see also* Doc. 93, pp. 17, 23).[6] Mr. Contreras stated that he wanted an

---

[6] The evidence regarding Mr. Contreras's ability to understand English shows that Mr. Contreras attended school in the United States until the third grade, when his family moved to Mexico. (Doc. 136, pp. 31, 35; *see also* Doc. 129-2, pp. 1–2). In Mexico, Mr. Contreras continued his education until he reached the ninth or tenth grade in the Mexican educational system. (Doc. 136, pp. 35–36). When Mr. Contreras returned to the United States, he did not attend school. (Doc. 136, p. 36). Mr. Contreras has not received a GED. (Doc. 136, p. 36).

As to Mr. Contreras's advice of rights, SA Morris wrote in his April 7, 2023, DEA report that he (SA Morris) "advised CONTRERAS of his [*Miranda* ] rights via a DEA-13 card, as witnessed by HIS Agent Justin Bowlin," (Doc. 140-1, p. 4, ¶ 18). In the report that SA Morris completed on April 10, 2023, SA Morris wrote that he read Mr. Contreras his *Miranda* rights. (Doc. 128-1, p. 1). SA Morris wrote: "SA Morris read CONTRERAS his Miranda rights via a DEA-13 card at 7:30 p.m." (Doc. 128-1, p. 1). The record does not contain a copy of a DEA-13 card, but the Court understands that the card is written in Spanish. (*See* Doc. 136, pp. 9, 23).

In the April 2024 hearing before Judge Johnson, SA Morris initially testified that he advised Mr. Contreras of his *Miranda* rights. (Doc. 93, pp. 10, 16). The attorney for the government asked SA Morris: "Did you advise the defendant, Mr. Contreras, at the time he was taken into custody, did you advise him of his Miranda rights?" (Doc. 93, p. 10). SA Morris replied: "I did." (Doc. 93, p. 10). Later in the same hearing, SA Morris testified that he "read [Mr. Contreras] Miranda." (Doc. 93, p. 16). Then, SA Morris testified that HIS Agent Bowlin advised Mr. Contreras of his *Miranda* rights in Spanish. (Doc. 93, p. 17).

During the July 2025 evidentiary hearing, SA Morris testified that HIS Agent Bowlin advised Mr. Contreras of his rights in Spanish. (Doc. 136, p. 9). SA Morris also testified during the hearing that he does not speak Spanish. (Doc. 136, p. 20; *see also* Doc. 93, pp. 14, 19).

The inconsistencies between SA Morris's reports and within his testimony undermine SA Morris's credibility. Given SA Morris's acknowledgement that he does not speak Spanish and his ultimate

attorney because "he had never been in this position before." (Doc. 128-1, p. 1; *see* Doc. 136, pp. 24–25). SA Morris testified that he understood Mr. Contreras to mean that he had never been in trouble before." (Doc. 136, p. 24). Mr. Contreras invoked his *Miranda* rights in English. (Doc. 136, pp. 11, 23; *see also* Doc. 128-1, p. 1 (indicating that Mr. Contreras invoked his *Miranda* rights at 7:30 p.m.); Doc. 136, p. 11 (indicating that HIS Bowlin read Mr. Contreras his *Miranda* rights at 7:33 p.m., and Mr. Contreras invoked his right to counsel at 7:35 p.m.)).[7] After Mr. Contreras invoked his right to counsel and told SA Morris that he wanted to speak to a lawyer because he had never been in a similar position, SA Morris continued to question Mr. Contreras while he was handcuffed in SA Morris's vehicle. (Doc. 136, pp. 9–10, 18–19).

At some point after agents cuffed Mr. Contreras, SA Morris removed Mr. Contreras's cellphone from Mr. Contreras's pocket. (Doc. 93, pp. 74–75; *see also* Doc. 93, pp. 20–21). Shortly after Mr. Contreras invoked his *Miranda* rights, SA

---

acknowledgement that Agent Bowlin read Mr. Contreras his rights in Spanish, the Court finds that SA Morris's statement in his reports that he provided *Miranda* warnings to Mr. Contreras is false. Given that SA Morris completed the reports within a few days of Mr. Contreras's arrest, the statement that SA Morris advised Mr. Contreras of his rights "as witnessed by HIS Agent Justin Bowlin" does not appear to be the product of a lapse of memory.

[7] According to SA Morris's April 10 Report of Investigation, SA Morris read Mr. Contreras his *Miranda* rights at 7:30 p.m.," and "[t]he interview was terminated at 7:33 p.m." (Doc. 128-1, p. 1; *see also* Doc. 129-2, p. 1). As noted, HIS Agent Bowlin advised Mr. Contreras of his rights, and as the evidence demonstrates, SA Morris did not terminate the interview. SA Morris's statement in his report that the interview terminated undermines SA Morris's credibility.

Morris held Mr. Contreras's phone in front of him and asked to search the phone. (Doc. 93, pp. 11, 23–24; Doc. 136, pp. 16, 24). Mr. Contreras asked: "Do I have to?" (Doc. 136, p. 25). SA Morris replied: "no, you don't have to, but I [will] take the phone, you know, and search the phone." (Doc. 136, p. 25). SA Morris told Mr. Contreras that "if he didn't consent to the search of the phone, [SA Morris] would get a search warrant to go through the phone." (Doc 136, p. 16).[8] Though HIS Bowlin believed that "[Mr. Contreras's] English [was] perfect," he read Mr. Contreras a consent form written in Spanish to obtain permission to search the phone. (Doc. 129-2, p. 1; Doc. 136. p. 12; *see* Doc. 129-3 ("Consentimiento A Ser Registrado" signed by Mr. Contreras and witnessed by SA Morris).[9]

After Mr. Contreras signed the consent form, SA Morris "had Mr. Contreras plug in the digits to his phone and the phone kept locking," so SA Morris "kept

---

[8] In the hearing before Judge Johnson, SA Morris testified that he said to Mr. Contreras: "hey can I look through your phone? At this point you don't have to. I could possibly get a search warrant. But, you know, it's up to you if you want to give me consent to look through your phone…. If you want to give me consent, then you can give me consent." (Doc. 93, pp. 43–44). In that hearing, Mr. Contreras testified that SA Morris stated he would search the phone whether he (Mr. Contreras) consented or not. (Doc. 93, pp. 75, 77–79).

During the July 2025 hearing, defense counsel asked SA Morris "you told my client if he didn't consent to the search of the phone, you would get a search warrant and go through the phone, correct?" (Doc. 136, p. 16). SA Morris responded "[y]es, I did." (Doc. 136, p. 16). SA Morris's testimony at the July 2025 hearing contradicts his testimony before Judge Johnson, and SA Morris's July 2025 testimony is consistent with Mr. Contreras's recollection of the exchange.

[9] The form did not contain language explaining an individual's right to refuse consent. (Doc. 93, p. 44; *see* Doc. 136, p. 25). Before asking Mr. Contreras to sign the Spanish-language form, SA Morris did not attempt to gauge Mr. Contreras's ability to read and write. (Doc. 136, p. 32).

asking [Mr. Contreras] for the password in order to keep unlocking his phone."
(Doc. 136, p. 13). In his April 10, 2023 "Report of Investigation," SA Morris wrote
that while he searched Mr. Contreras's phone, Mr. Contreras "voluntarily opened
several applications that were password protected. CONTRERAS also told agents
the numerical password to open his cellphone, '0215.'" (Doc. 128-1, pp. 1–2).
During the July 2025 hearing, SA Morris testified that while Mr. Contreras sat beside
him in his law enforcement vehicle with his hands cuffed, he would ask Mr.
Contreras to open an app, either by providing his password or by using his face to
open apps triggered by facial recognition. (Doc. 136, pp. 25-26, 33). SA Morris
would hold the phone up to Mr. Contreras's face to open apps that were triggered by
facial recognition. (Doc. 136, pp. 25-26, 33).

SA Morris opened his phone's recorder app and began recording his
interaction with Mr. Contreras 15 minutes into the interview after Mr. Contreras
signed the consent form and after SA Morris repeatedly asked Mr. Contreras for the
password to his phone. (Doc. 136, pp. 25, 30; Doc. 93, pp. 14–15).[10] At the hearing
before Judge Johnson, SA Morris agreed with the assertion by government counsel

---

[10] The record contains a transcript of SA Morris's recording of his conversation with Mr.
Contreras. The transcript does not contain a request for the password to Mr. Contreras's phone.
(Doc. 129-2). SA Morris testified at the hearing before Judge Johnson that he must have asked
Mr. Contreras for his password before he turned his recorder on "[b]ecause listening to the
recording, he doesn't say it." (Doc. 93, p. 26). In the July 2025 hearing, SA Morris stated that he
asked Mr. Contreras for his password three or four times before he wrote down the password.
(Doc. 136, p. 26).

11

that there "would [not] have been much of anything to record" before then "[b]ecause [Mr. Contreras] invoked Miranda." (Doc. 93, p. 16). Not so. Had SA Morris turned his recorder on sooner, the Court would know, for example, how many times SA Morris asked Mr. Contreras for his passcode or asked Mr. Contreras to type his passcode into his phone. Fifteen minutes of interaction between SA Morris and Mr. Contreras is largely unaccounted for. (Doc. 136, pp. 20-21).

After Mr. Contreras signed the Spanish-language consent form, SA Morris questioned Mr. Contreras in English as he went through Mr. Contreras's phone. During the July 2025 hearing, SA Morris acknowledged that during the 21 minutes of recorded conversation, he repeatedly tried to engage Mr. Contreras in conversation. (Doc. 136, pp. 18, 20). The audio recording begins with extended periods of silence while SA Morris looked through Mr. Contreras's phone. (*See* Doc. 129-2, p. 1). Two minutes into the recording, SA Morris remarked that Mr. Contreras had his pictures "on lock." (Doc. 129-1, 2:00). After another two and one-half minutes, Mr. Contreras said to SA Morris. "I can't show you that one." (Doc. 129-1, 4:38; Doc. 129-2, p. 2). Mr. Contreras hesitated, stated that the locked material contained "nudes and pictures," and stated, "I mean you can look at it." (Doc. 129-2, pp. 2–3). SA Morris replied: "just show me, I just wanna make sure nothing else . . . I don't care about nudes." (Doc. 129-2, p. 3). Six minutes into the

recording, SA Morris said to Mr. Contreras, "how about this one?"  (Doc. 129-1, 6:01).

Seven minutes into the recording, SA Morris commented that he was "pretty much done" with Mr. Contreras's phone, and he urged Mr. Contreras to "save [himself] a lot of drama and go ahead and just talk to me about today."  (Doc. 136, pp. 18–19. Doc. 129-1, 7:03–17; Doc. 129-2, p. 3).  Mr. Contreras replied:  "I don't know what's going on, that's the thing that it's my first time, so I don't want to say something that will get me in trouble, without even you know . . . I just, could talk to you right now but it would be better if my [lawyer] was here, I could ask a quick question."  (Doc. 129-1, 7:30–7:53; Doc. 129-2, p. 3).  SA Morris stated that "sometimes it's easier" to talk and indicated that he would not "ask any more" about "what happened."  (Doc. 129-1, 8:01–8:20; Doc. 129-2, p. 3).  Seconds later, SA Morris remarked:  "You have a password on everything!"  (Doc. 129-1, 8:27; Doc. 129-2, p. 3).  Nine and one-half minutes into the recording, while Mr. Contreras remained cuffed in SA Morris's car with SA Morris to his left and Agent Bowlin seated behind him, SA Morris began watching videos on Mr. Contreras's phone and began discussing with Agent Bowlin the meaning of the Spanish spoken on one of the videos.  (Doc. 129-1, 9:32–10:00; Doc. 129-2, pp. 3–4).

Twelve minutes into the video, SA Morris began playing part of a recording repeatedly while he asked Agent Bowlin to interpret the Spanish.  (Doc. 129-1.

12:02-12:52).  Agent Bowlin translated:  "I wanna see everything," (Doc. 129-2, p. 4), and SA Morris said to Mr. Contreras, "just tell me what you were saying because it sounds like everything good."  (Doc. 129-1, 13:38–13:46; Doc. 129-2, p. 4). Referring to the video, SA Morris then asked Mr. Contreras:  "What's inside?" (Doc. 129-1, 13:49–13:50; Doc. 129-2, p. 4).  SA Morris continued to press Mr. Conteras for information about the video while he played the video segment over and over again.  (Doc. 129-1, 13:50–4:12).[11]  SA Morris then said in a firm voice:  "I think you know more than you are letting us know." (Doc. 129-1, 14:13–14:20; Doc. 129-2, p. 4).  SA Morris stated:  "You're sweating a lot right now." (Doc. 129-1, 14:23–14:25; Doc. 129-2, p. 4).  The exchange continued.  (Doc. 129-1, 14:25–17:27; Doc. 129-2, p. 5).  HIS Agent Bowlin then played the video segment a few times and said to Mr. Contreras:  "Buddy, I just want you to know I'm not calling you a liar, I just noticed when that video popped up you got real nervous." (Doc. 129-1, 17:28-17:36; Doc. 12-2, p. 6).  Mr. Contreras reiterated:  "this is my first time, so you know I don't want to make something you know, you know what I'm saying." (Doc. 129-1 at 17:36–17:48; Doc. 129-2, p. 6).

Nearly 19 minutes into the recording, SA Morris said again:  "You got a password on everything."  (Doc. 129-18:56–18:58; Doc. 129-2, p. 6).  Finally, SA

---

[11] SA Morris played the video segment more than two dozen times consecutively.  (Doc. 129-1, 12:02–16:14, 16:23-16:32, 16:58-17:03).

Morris asked Mr. Contreras again for the passcode for his phone before ending the recording. (Doc. 129-1, 20:44–20:47; Doc. 129-2, p. 7).

The phone SA Morris took from Mr. Contreras was an Apple iPhone 12 Pro Max. (Doc. 129-3, p. 1). SA Morris testified that if he had not obtained the password for the iPhone from Mr. Contreras, the DEA's technology department would have used software to unlock to phone. (Doc. 136, pp. 14–15). Neither SA Morris nor "anyone else involved in the investigation was preparing a search warrant" for the iPhone when SA Morris told Mr. Contreras that if he did not consent to a search of the phone, then he (SA Morris) would get a search warrant. (Doc. 136, p. 16). Using the password that Mr. Contreras provided, the DEA extracted the contents of Mr. Contreras's iPhone. (Doc. 136, p. 17). SA Morris does not know whether, at the time of Mr. Contreras's arrest, a version of Cellebrite, the program agents use to extract information from iPhones, was available that would have allowed the DEA to access the contents of Mr. Contreras's phone in the absence of consent to search. (Doc. 136, pp. 29–30). SA Morris acknowledges that if Mr. Contreras had been given a lawyer when he invoked his right to remain silent and if the lawyer had advised Mr. Contreras not to give SA Morris the passcode for Mr. Contreras's iPhone, he would not have been able to open the phone and access its contents without compatible Cellebrite software. (Doc. 136, p. 33).

## III.

On the record before him, Judge Johnson found that Mr. Contreras made an unambiguous request for an attorney and that the agents' interrogation of Mr. Contreras violated *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981). (Doc. 105, pp. 15–24). Judge Johnson concluded that the agents obtained Mr. Contreras's cell phone password in violation of *Miranda* and that the exclusionary rule extended to the iPhone's contents because *United States v. Patane*, 542 U.S. 630 (2004), does not apply here. (Doc. 105, pp. 24–68). On the record before him, Judge Johnson found that Mr. Contreras gave knowing and voluntary consent to the agents to search his cell phone. (Doc. 105, pp. 68–87). Coupled with SA Morris's testimony about the Cellebrite software, Judge Johnson reasoned that the contents of Mr. Contreras's cell phone were admissible under the inevitable discovery doctrine. (Doc. 105, pp. 87–94).

Neither the United States nor Mr. Contreras has objected to Judge Johnson's findings concerning the agents' violations of *Miranda* and *Edwards*, the inadmissibility of Mr. Contreras's password, and the inapplicability of *Patane* in the circumstances of this case. (*See* Doc. 106; Doc. 105, pp. 15–71). The evidence fully supports these findings. Therefore, the Court adopts Judge Johnson's thoughtful, well-reasoned conclusions concerning these issues.

16

***

On the record before him, Judge Johnson reasoned that the agents' search of Mr. Contreras's cell phone did not violate the Fourth Amendment because, viewing the totality of the circumstances, Mr. Contreras voluntarily consented to the search. (Doc. 105, pp. 71–83). Mr. Contreras objects to Judge Johnson's factual findings and conclusions, but Mr. Contreras does not object to Judge Johnson's description of the legal principles that govern the consent inquiry. The principles are these:

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It "is a basic principle of Fourth Amendment law . . . that searches and seizures . . . without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citations and internal quotation marks omitted). Nonetheless, "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. . . . Accordingly, the warrant requirement is subject to certain reasonable exceptions." *Id.* (citations and internal quotation marks omitted). "Of course, the burden of proving an exception to the warrant requirement lies with the Government." *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).
>
> Voluntary consent constitutes a valid exception to the warrant requirement. Whether a suspect voluntarily gave consent to a search constitutes a question of fact determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984), *vacated*, 741 F.2d 1363, *reinstated on reh'g*, 764 F.2d 747 (11th Cir. 1985) (en banc). The government bears the burden of proving both the existence of consent and that an individual freely and voluntarily gave consent. *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir. 1987). Relevant factors in determining whether an individual voluntarily gave consent to a search include the "voluntariness of the

17

defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence and, … the defendant's belief that no incriminating evidence will be found." *Chemaly*, 741 F.2d at 1352 (citation omitted).

The police need not secure written consent, as verbal consent fosters equal validity if it meets the standard for voluntariness. *See Schneckloth*, 412 U.S. at 233 (noting "it is only by analyzing all the circumstances of an individual['s] consent that it can be ascertained whether in fact it was voluntary or coerced"); *United States v. Alim*, 256 Fed. App'x 236, 239 (11th Cir. 2007) (unpublished) ("Alim refused to execute the preprinted consent-to-search form at the same time that he provided his oral consent to a search of the business premises … , demonstrating that he was not merely acquiescing to the actions of the officers"); *United States v. LeBeau*, 867 F.3d 960 (8th Cir. 2017) (finding suspect voluntarily consented to the search of his vehicle even though he "did not sign a separate consent form"); *United States v. Weeks*, 666 F. Supp. 2d 1354, 1375 (N.D. Ga. 2009) ("[T]he agents did not need a written consent to search the apartment since a verbal consent is sufficient.").

(Doc. 105, pp. 71–72). Weighing these factors, Judge Johnson concluded:

Although the agents arrested Ramos Contreras and placed him in a custodial environment, he nevertheless appeared to understand his options. Moreover, Ramos Contreras spoke proficient English, asked no questions about the contents of the consent form, and never attempted to revoke consent while the agents searched his phone in his presence. Furthermore, the agents did not raise their voices, brandish weapons, or issue threats. Therefore, the Fourth Amendment does not mar the admissibility of the cell phone's contents in this regard.

(Doc. 105, p. 83).

Mr. Contreras objects to Judge Johnson's analysis of the consent factors and argues that Judge Johnson should have considered two additional factors – "the

18

flagrancy of the official misconduct" and "the lack of any temporal pause between the tainted conversations and the alleged consent." (Doc. 106, pp. 4–5) (internal quotation marks omitted) (first quoting *United States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000); and then quoting *United States v. Delancy*, 502 F.3d 1297, 1310 (11th Cir. 2007)). The Court agrees but does not rely on *Santa* or *Delancy*.[12] In analyzing anew the factors discussed in *Chemaly*, the Court emphasizes that the record has changed since Judge Johnson wrote his report, and new evidence casts the evidence on which Judge Johnson relied in a substantively different light.

With respect to custodial status, it is undisputed that several agents arrested Mr. Contreras and his two codefendants, and the agents placed the defendants in handcuffs. (Doc. 136, pp. 22–23). SA Morris placed Mr. Contreras in his vehicle and sat to the left of Mr. Contreras while HIS Agent Bowlin sat behind Mr. Contreras. SA Morris reported that Mr. Contreras was in custody, (Doc. 93, p. 22;

---

[12] As the Court will discuss, *Santa* and *Delancy* provide corollary principles that support the Court's analysis, but the decisions are not on all fours with this case.

In *Chemaly*, the list of consent factors that the Eleventh Circuit provided follow the word "include," indicating that the list is not exhaustive. *Chemaly*, 741 F.2d at 1352; *see Glover v. Ocwen Loan Serv., LLC,* 127 F.4th 1278, 1289 (11th Cir. 2025) ("To 'include' is to 'contain' or 'comprise as part of a whole.'" (quotation omitted)); *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) (agreeing that "the use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive."); *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968) ("The word 'includes' is usually a term of enlargement, and not of limitation." (citations omitted) (quoting *United States v. Gertz*, 249 F.2d 662, 666 (9th Cir. 1957)); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Text 132–33 (2012) (explaining that "include does not ordinarily introduce an exhaustive list" but "introduces examples"). Therefore, the Court may consider factors other than the factors the Eleventh Circuit discussed in *Chemaly*.

Doc. 136, pp. 12, 21–23), and he testified that Mr. Contreras's hands were cuffed in front of him while he spoke to Mr. Contreras, (Doc. 136, pp. 12, 21). The custodial status factor weighs against the government.

As for the presence of coercive police procedure, as Judge Johnson noted, there is no evidence that SA Morris or Agent Bowlin brandished a weapon or used aggressive language before Mr. Contreras signed the consent form, but that is not the type of coercion that infects the consent process here. The evidence of coercion here consists of the agents' consistent, blatant disregard for Mr. Contreras's rights and the subsequent false reporting to cover the violations of Mr. Contreras's constitutional rights.

To evaluate the totality of the circumstances surrounding Mr. Contreras's signing of the consent form, the Court begins with the flagrant *Miranda* violation in this case, a violation exacerbated by SA Morris's failure to record the first 15 minutes of his interaction with Mr. Contreras and his false account of the advice of rights in his written reports. The evidence from the July 2025 hearing demonstrates that soon after SA Morris placed Mr. Contreras in handcuffs, he took Mr. Contreras's phone from him. (Doc. 93, p. 75; *see also* Doc. 93, pp. 20–21). There is no evidence that SA Morris asked for permission to take the phone from Mr. Contreras's clothing. Once in SA Morris's vehicle, Agent Bowlin advised Mr. Contreras of his *Miranda* rights in Spanish, and Mr. Contreras invoked his rights in English. (Doc.

20

136, pp. 11, 23; *see also* Doc. 128-1, p. 1).  Mr. Contreras explained why he wanted a lawyer – he stated in English that "he had never been in this position before," (Doc. 128-1, p. 1; *see* Doc. 136, p. 24), which SA Morris understood to mean that Mr. Contreras had never been in trouble before, (Doc. 136, p. 24).

When Mr. Contreras indicated that he needed a lawyer and that he wished to remain silent, SA Morris did not terminate the interview as he wrote in his report, and he did not return Mr. Contreras's phone.  Instead, SA Morris held the phone in Mr. Contreras's face to see if he could unlock the phone through facial recognition. (Doc. 136, pp. 9–10, 16, 18–19, 25; Doc. 93, pp. 11, 23–24).  When that didn't work, SA Morris asked if he could search the phone, and Mr. Contreras responded:  "Do I have to?"  (Doc. 136, p. 25).  SA Morris replied:  "no, you don't have to, but I [will] take the phone, you know, and search the phone."  (Doc. 136, p. 25).  SA Morris told Mr. Contreras that "if he didn't consent to the search of the phone," he (SA Morris) "would get a search warrant to go through the phone."  (Doc 136, p. 16).  During the July 2025 hearing, defense counsel asked SA Morris:  "you told my client if he didn't consent to the search of the phone, you would get a search warrant and go through the phone, correct?"  (Doc. 136, p. 16).  SA Morris responded "[y]es, I did."  (Doc. 136, p. 16).  SA Morris's ultimatum communicated to Mr. Contreras that he did not

have an option; SA Morris would search the phone whether he consented or not.[13] And just before SA Morris delivered this ultimatum, Mr. Contreras told SA Morris that he had not been in trouble before, that he did not know what was going on, and that he wanted to talk to a lawyer. Precedent provides that the giving of consent to search does not implicate the Fifth Amendment because consent is not communicative, *United States v.* Hidalgo, 7 F.3d 1566, 1568 (11th Cir. 1993), but the conversations surrounding Mr. Contreras's signing of the consent form are relevant to the coercive statements that agents used to obtain Mr. Contreras's signature.

SA Morris's ultimatum resembles the evidence in *Bumper v. North Carolina*, 391 U.S. 543 (1968). There, law enforcement officers informed the owner of a dwelling that they had a warrant to search the premises, but the officers did not show or read the warrant to the owner. 391 U.S. at 546–47. The owner acquiesced to the search. *Bumper*, 391 U.S. at 546–47. The Supreme Court considered "whether a search can be justified as lawful on the basis of consent when that 'consent' has been

---

[13] In the hearing before Judge Johnson, Mr. Contreras testified that SA Morris stated he would search the phone whether Mr. Contreras consented or not. (Doc. 93, pp. 75, 77–79). Judge Johnson did not credit that testimony because he accepted SA Morris's testimony that he said to Mr. Contreras: "hey can I look through your phone? At this point you don't have to. I could possibly get a search warrant. But, you know, it's up to you if you want to give me consent to look through your phone…. If you want to give me consent, then you can give me consent." (Doc. 93, pp. 43–44). SA Morris's testimony at the July 2025 hearing contradicts his earlier testimony, and SA Morris's July 2025 testimony is consistent with Mr. Contreras's recollection of the exchange.

given only after the official conducting the search has asserted that he possesses a warrant." *Bumper*, 391 U.S. at 548. The Supreme Court answered this question in the negative, indicating that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Bumper*, 391 U.S. at 550. The *Bumper* Court described this scenario as "instinct with coercion—albeit colorably lawful coercion." 391 U.S. at 550.

As in *Bumper*, SA Morris did not present Mr. Contreras with a meaningful choice when he asked for permission to search the iPhone because in response to Mr. Contreras's question, "Do I have to?," SA Morris told Mr. Contreras that he would search the phone regardless of Mr. Contreras's consent. The answer was consistent with SA Morris's conduct to that point, conduct which demonstrated complete disregard for Mr. Contreras's rights. The events that led Mr. Contreras to sign the consent form signaled that the agents were going to do whatever they wanted regardless of what he asked, and they were not going to give Mr. Contreras an opportunity to speak to an attorney to help him understand his rights.

Within the 15 unrecorded minutes of interaction between the agents and Mr. Contreras, SA Morris "had Mr. Contreras plug in the digits to his phone" and because "the phone kept locking," SA Morris "kept asking [Mr. Contreras] for the password in order to keep unlocking his phone." (Doc. 136, p. 13) (brackets added).

SA Morris testified that he probably asked Mr. Contreras for his password three or four times before writing the password down. (Doc. 136, p. 26). Given that 15 minutes passed before SA Morris began recording his interaction with Mr. Contreras, given that the recorded part of SA Morris's interaction does not include a request for the phone password, and given the credibility issues concerning SA Morris's testimony, it is just as likely that SA Morris asked Mr. Contreras for his password or waived the iPhone in front of Mr. Contreras's face more than three or four times, all despite Mr. Contreras's request for an attorney, his statement that he had no experience with law enforcement, and his stated desire to remain silent.

The agents' recorded conduct after Mr. Contreras signed the consent form corroborates the Court's analysis of the agents' unrecorded conduct and undermines SA Morris's assertion in his written report that Mr. Contreras "voluntarily opened several applications that were password protected." (Doc. 128-1, pp. 1–2). As the recording begins, Mr. Contreras still is handcuffed in SA Morris's car seated beside SA Morris as SA Morris begins going through Mr. Contreras's phone with Agent Bowlin looking over the front seat at the phone. For nine minutes, SA Morris tried to access the material that Mr. Contreras had locked on his phone. When Mr. Contreras indicated that he did not want to give SA Morris access to certain pictures, SA Morris responded: "just show me, I just wanna make sure nothing else . . . I don't care about nudes." (Doc. 129-2, p. 3).

As noted, as SA Morris looked through the phone, the recording contains periods of silence.  Mr. Contreras spoke to the agents when spoken to.[14]  When SA Morris spoke to Mr. Contreras, he urged Mr. Contreras to waive his rights and speak to him,  (Doc. 129-1, 7:03-7:17, 8:01-8:25; Doc. 129-2, p. 3; Doc. 136, pp. 18–19), and when SA Morris found a video of Mr. Contreras near the ovens speaking Spanish, SA Morris became firm in his requests for answers.  SA Morris said to Mr. Contreras, "just tell me what you were saying," (Doc. 129-1, 13:38–13:46; Doc. 129-2, p. 4), and SA Morris asked Mr. Contreras, "What's inside," (Doc. 129-1, 13:49-13:50; Doc. 129-2, p. 4) – this despite the fact that Mr. Contreras told the agents again that it was his first time interacting with law enforcement and that he needed to ask a lawyer questions before speaking to the officers,  (Doc. 129-1, 7:30–7:53; Doc. 129-2, p. 3).  A third time, after the agents played the video dozens of times and pressured Mr. Contreras with comments like "I think you know more than you are letting us know," (Doc. 129-1, 14:13–14:20; Doc. 129-2, p. 4), "You're sweating a lot right now," (Doc. 129-1, 14:23–14:25; Doc. 129-2, p. 4), and "I just noticed when that video popped up you got real nervous," (Doc. 129-1, 17:28-17:36; Doc.

---

[14] SA Morris testified during the July 2025 hearing that Mr. Contreras began translating a video found on the iPhone without being prompted by the agents, (Doc. 136, pp. 19–20), but the recorded exchange contradicts SA Morris's testimony on this point, (Doc. 129-1, 11:40–12:35 (SA Morris stating to Mr. Contreras, "You about to send that [video] to somebody?" and playing the video at least ten times before Mr. Contreras made a statement regarding the video).  The transcript of the recorded portion of the interview does not include the question, "you about to send that to somebody," (Doc. 129-2), but the question is audible in the recording.

12-2, p. 6), Mr. Contreras communicated to the agents his concerns about talking to them, (Doc. 129-1 at 17:36–17:48; Doc. 129-2, p. 6). The agents' flagrant disregard of Mr. Contreras's rights in the recorded portion of the interview is consistent with the evidence concerning the agents' similar disregard of his rights before he signed the consent form.[15]

---

[15] Under these circumstances, the Eleventh Circuit's consent analysis in *United States v. Santa* is persuasive, and the consent concepts that the Eleventh Circuit discussed with respect to a preceding Fourth Amendment violation translate to the circumstances involving the Fifth Amendment violation in this case. In *Santa*, before agents sought consent from a handcuffed suspect to search his apartment, the agents violated the suspect's Fourth Amendment rights by entering the apartment without a warrant. *Santa*, 236 F.3d at 668–76. The Eleventh Circuit explained that "[f]or consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure." 236 F.3d at 676. The Eleventh Circuit added: "the second requirement focuses on causation: '[w]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 236 F.3d at 676–77 (quoting *Wong Sun v. United States,* 371 U.S. 471, 488 (1963) (brackets in *Santa*); *see also United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007) ("We are obliged to determine whether the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion,' or, alternatively, whether the causal connection had 'become so attenuated as to dissipate the taint.'") (quoting *Wong Sun*, 371 U.S. at 486–87). "Three factors to be considered in determining whether a voluntary consent was obtained by exploitation of an illegal seizure are: the temporal proximity of the seizure and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." 236 F.3d at 677 (citations omitted); *see Delancy*, 502 F.3d at 1309–10 (explaining that the three factors are not exhaustive and another factor courts have considered is "whether the arrestee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search"). In *Santa*, the Eleventh Circuit reasoned that even if it assumed that the suspect's consent was voluntary, the government did not carry its burden of demonstrating that the consent was not tainted by the illegal entry and arrest. 236 F.3d at 677. The evidence in *Santa* established that agents requested and received the suspect's consent to search within three minutes of an unlawful entry and handcuffing of the suspect on the floor of his apartment. The agents told the suspect to "'just make things easy and tell [them] where the drugs were.'" 236 F.3d at 677. The Eleventh Circuit held that "there was neither a significant lapse of time nor any intervening circumstance which could be said to have dissipated the effect of the illegality." 236 F.3d at 678.

At the hearing before Judge Johnson, in response to questions from Judge Johnson, Mr. Contreras testified that he signed the consent form because he understood that the agents would search his phone whether he gave consent or not:

> Q. Okay. Now, what was then asked about the phone after that, as you recall?
>
> A. They were asking me if they can go through my phone. And I asked them, so if I say no, will you still go through it? And they were like yeah.
> So I thought maybe if I now say no, they would still go through my phone. So that's why.
>
> Q. Okay. So did you think you had a choice one way or the other?
>
> A. No, I didn't.
>
> . . .

---

For the reasons discussed in this opinion, the Court finds that Mr. Contreras's consent was not voluntary. Even if it were, the government has not demonstrated a sufficient break between the continuing, flagrant Fifth Amendment violation and the agents' request for consent to search the iPhone. While Mr. Contreras was handcuffed in SA Morris's vehicle with SA Morris and Agent Bowlin, despite Mr. Contreras's request for attorney to help him understand his rights, SA Morris repeatedly placed the iPhone before Mr. Contreras's face to activate facial recognition and asked Mr. Contreras for the iPhone passcode, all in the context of asking Mr. Contreras to sign a consent form that the government acknowledges did not inform Mr. Contreras of his right to decline consent. (Doc. 93, p. 44; *see* Doc. 136, p. 25) (SA Morris's testimony that he understands that the Spanish-language consent form does not disclose an individual's right to refuse consent); Doc. 129-4 (English translation of DEA consent form). The Fifth Amendment violation continued after Mr. Contreras signed the form, with agents urging Mr. Contreras to "save [himself] a lot of drama" and talk to them, (Doc. 136, pp. 18–19. Doc. 129-1, 7:03–17; Doc. 129-2, p. 3), to which Mr. Contreras replied: "I don't know what's going on, that's the thing that it's my first time, so I don't want to say something that will get me in trouble, without even you know . . . I just, could talk to you right now but it would be better if my [lawyer] was here, I could ask a quick question." (Doc. 129-1, 7:30–7:53; Doc. 129-2, p. 3). SA Morris's request for consent is sandwiched in a continuous Fifth Amendment violation that spanned more than 30 minutes. Under the rationale of *Wong* and *Santa*, Mr. Contreras's consent, even if voluntary, is tainted by the Fifth Amendment violation, such that the agents' search of the iPhone is unconstitutional.

Q.  I want to be really careful.  Is that exact – what exactly were you told?

A.  It was that if asking if – what happened if I say no.  He would still go through my phone, and he said yeah.  But I thought even if I say no, they're still going to go through it, so I'll just say yes.

Q.  So they asked can we search your phone?

A.  Yes.

Q.  And you ask what happens if I say no?

A.  Yes.

Q.  And they say we're going to search it anyway?

A.  Yes.

Q.  That is what they said, and that's your testimony today, correct?

A.  Yes.

. . .

A.  Yeah.  He told me – because, again, he – they asked me we can go through your phone.  And I said what's going to happen if I say no? They said they still going to go through it.  So he was like yeah, you know.  And that's what I – he told me that's what I thought.  So just okay, go ahead.

(Doc. 93, pp. 75, 77–79).

Judge Johnson credited SA Morris's testimony over Mr. Contreras's testimony.  (Doc. 105, pp. 78–79).  At the hearing before Judge Johnson, SA Morris testified that he informed Mr. Contreras that Mr. Contreras did not have to consent

28

to the search, and he indicated to Mr. Contreras that he "possibly" could acquire a search warrant but that "it [was] up to [Mr. Contreras] if [he] want[ed] to give [SA Morris] consent to look through [the] phone."  (Doc. 93, pp. 43–44).  At the July 2025 hearing, SA Morris's testimony aligned with Mr. Contreras's recollection of the unrecorded conversation concerning the agents' search of Mr. Contreras's phone.  SA Morris acknowledged that Mr. Contreras asked if he had to give consent, and SA Morris testified that he replied:  "no, you don't have to, but I [will] take the phone, you know, and search the phone," (Doc. 136, p. 25), and he told Mr. Contreras that "if Mr. Contreras's didn't consent to the search of the phone, he [SA Morris] would get a search warrant and go through the phone," (Doc. 136, p. 16).  The evidence from the July 2025 hearing demonstrates that SA Morris's testimony under oath during the hearing before Judge Johnson was not credible because SA Morris was not forthright about his remarks to Mr. Contreras.

The Court finds support for its assessment of SA Morris's credibility in the ways in which SA Morris documented his interaction with Mr. Contreras.  SA Morris testified that he did not start the recording at the beginning of his interview because "there [were] a lot of moving parts at the time."  (Doc. 93, p. 16).  The record says otherwise.  SA Morris sat Mr. Contreras in his car and began interviewing Mr. Contreras, with Agent Bowlin observing from the back seat of SA Morris's car.  There is no evidence that Mr. Contreras resisted the agents or tried to

flee.  SA Morris had taken Mr. Contreras's phone from him before they arrived at SA Morris's car.  Mr. Contreras sat handcuffed in SA Morris vehicle, and SA Morris began a more than 30-minute process of trying to coerce Mr. Contreras to provide information to the agents against his expressed desire to speak to an attorney.  The only "moving parts" during the 15 minutes of unrecorded conversation were SA Morris's repeated violation of Mr. Contreras's Fifth Amendment after Mr. Contreras asked to speak to an attorney.  In the hearing before Judge Johnson, SA Morris testified that he "quickly realized that [he] did not record [the interview] at the beginning," and "[a]s soon as [he] realized, [he] then began the recording."  (Doc. 93, p. 16).  But SA Morris did not start recording until approximately 12 minutes after Agent Bowlin read Mr. Contreras the *Miranda* warning, and Mr. Contreras stated that he wanted to speak to an attorney.  SA Morris's testimony that he forgot to start the recording until 15 minutes into the interview is not credible given SA Morris's 13 years of experience as a law enforcement officer, (Doc. 136, pp. 7, 49), the amount of time between the beginning of the interview and the beginning of the recording, and the fact that SA Morris conveniently delayed recording until after the critical communications about *Miranda*, the password for the iPhone, and consent concluded.[16]

---

[16] As noted, in the April 7, 2023, report that SA Morris completed concerning Mr. Contreras's arrest, SA Morris wrote that, "without incident," "agents approached and arrested" Mr. Contreras and two other individuals who were standing at the back of a truck.  (Doc. 140-1, p. 4, ¶ 16).  As

In sum, the evidence from the July 2025 evidentiary hearing conclusively demonstrates that Mr. Contreras was handcuffed in SA Morris's car when SA Morris asked for consent to search the iPhone, so the *Chemaly* custodial status factor weighs against a finding that Mr. Contreras's consent was voluntary. Similarly, the presence of coercive police procedure in the form of Agents Morris and Bowlin flagrantly violating Mr. Contreras's Fifth Amendment rights over an extended period and SA Morris's statement to Mr. Contreras that he would search the phone whether Mr. Contreras consented or not weighs against a finding that consent was voluntary. Relatedly, the lack of a temporal pause between the Fifth Amendment violations that occurred before and after Mr. Contreras signed the consent form weighs against a finding that his consent was voluntary. SA Morris's ultimatum, coupled with the lack of information in the Spanish-language consent form about Mr. Contreras's ability to refuse consent, weighs against a finding that Mr. Contreras voluntarily consented to a search of the iPhone. Mr. Contreras's three statements to SA Morris

_____

previously discussed, the record indicates that there were at least three DEA special agents, one task force officer, and one Homeland Security officer at the scene of the arrest, (Doc. 104-1, p. 4, ¶ 18), and perhaps as many as four DEA agents, two HIS agents, and four TFOs, (Doc. 104-1, p. 5, ¶ 22). The superior law enforcement presence indicates that officers had control over the arrest of Mr. Contreras and his two codefendants. Nothing in the record indicates that while SA Morris (and Agent Bowlin) interviewed Mr. Contreras and went through the iPhone, SA Morris was distracted by or asked to assist in the interviews of Mr. Contreras's two co-defendants.

As discussed earlier in this opinion, the Court finds that SA Morris misreported information concerning the advice of rights administered to Mr. Contreras. *See* pages 8–9, n. 6. The misinformation in the report also substantiates the Court's credibility findings.

and Agent Bowlin that he had never been in trouble before and did not know what was going on also weigh against a finding that consent was voluntary.[17]  As for cooperation, Mr. Contreras spoke to SA Morris and Agent Bowlin only when they asked him for information or made comments about information on the cell phone, comments designed to coax Mr. Contreras into waiving his right to speak to an attorney.  This too weighs against a finding that consent was voluntary.

On this record, the government has not carried its burden of proving that Mr. Contreras freely and voluntarily gave consent to search the phone.  The Court sustains Mr. Contreras's objection to the voluntariness of his consent to the agents' search of the iPhone.[18]

***

Judge Johnson reasoned that despite the agents' violations of Mr. Contreras's right to counsel, the Court should not suppress the cell phone's contents because the government carried its burden of establishing by a preponderance of the evidence that the agents inevitably would have obtained this evidence.  (Doc. 105, pp. 90–94). Two findings supported Judge Johnson's conclusion - his findings that Mr. Contreras

---

[17] Mr. Contreras's lack of experience with law enforcement speaks to Mr. Contreras's understanding of his constitutional rights.  So does his education; he does not have a GED or an equivalent degree.  (Doc. 136, p. 36).  The evidence demonstrates that neither SA Morris nor Agent Bowlin attempted to determine how far Mr. Contreras had gone in school or his ability to read the Spanish-language consent form.  (Doc. 136, pp. 31–32).

[18] Because the Court sustains Mr. Contreras's objection on the voluntariness of the search, the Court does not reach Mr. Contreras's objection as to the scope of the search.

consented to the search of the iPhone and that the government's "technology personnel possessed the requisite tools to unlock the [iPhone] without a passcode," namely Cellebrite software. (Doc. 105, pp. 90–93). Mr. Contreras objects to the findings; he argues that the government did not meet its burden of showing that that discovery inevitably would have occurred. (Doc. 106, pp. 5–6).

> As Judge Johnson stated:
>
> The inevitable discovery doctrine permits the admission of evidence if the government establishes by a preponderance of the evidence that "if there had been no constitutional violation, the evidence in question would have been discovered by lawful means." *United States v. Watkins*, 13 F.4th 1202, 1211 (11th Cir. 2021) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

(Doc. 105, p. 88) (footnote omitted). As explained in this opinion, the government has not carried its burden to prove that Mr. Contreras voluntarily consented to the agents' search of his phone. Therefore, Mr. Contreras's consent cannot support a finding of inevitable discovery. Assuming *arguendo* that SA Morris's testimony suffices to demonstrate that the government could have used Cellebrite to access the contents of Mr. Contreras's cell phone, SA Morris's testimony does not show that lawful means which would have made discovery inevitable, namely a search warrant, were being actively pursued before the constitutional violation occurred. *Carpenter v. United* States, 585 U.S. 296, 305 (2018) (stating that "police officers must generally obtain a warrant before searching the contents of a phone") (citing *Riley v. California*, 573 U.S. (2014)); *Riley*, 573 U.S. at 401 ("[A] warrant is

generally required before such a search, even when a cell phone is seized incident to arrest").[19]

Relying on binding Fifth Circuit precedent, in *United States v. Satterfield*, the Eleventh Circuit held that "if evidence is obtained by illegal conduct, the illegality can be cured only if the police possessed and were pursuing a lawful means of discovery at the time the illegality occurred." 743 F.2d 827, 846 (11th Cir. 1984), *superseded by statute on other grounds as recognized in United States v. Watkins*, 13 F.4th 1202, 1215 (11th Cir. 2021) (en banc), (citing *United States v. Brookins*, 614 F.2d 1307 (5th Cir. 1980)).[20]

> The Government cannot later initiate a lawful avenue of obtaining the evidence and then claim that it should be admitted because its discovery was inevitable. This is a sound rule, especially when applied to a case in which a search warrant was constitutionally required.

*Satterfield*, 743 F.2d at 846. In *Satterfield*, the Eleventh Circuit concluded that because "the Government had not yet initiated the lawful means that would have led to the discovery of the [firearm] evidence" when "the Government violated Satterfield's fourth amendment right," the Government "did not possess the legal

---

[19] In the July 2025 hearing, SA Morris testified that he could not recall the model number of Mr. Contreras's iPhone, and he could not "say a hundred percent" that Cellebrite software could have enabled agents to access the contents of the iPhone because he was "not familiar with the technology or what the technology guys have," so he could not "say for sure whether or not, if I have a password or not, what would have happened." (Doc. 136, pp. 29–30).

[20] Decisions issued by the Fifth Circuit prior to September 30, 1981, are binding Eleventh Circuit precedent. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

means that would have led to the discovery of the shotgun" such that the exclusionary rule precluded introduction of that evidence at trial. *Satterfield*, 743 F.2d at 846. Per *Watkins*, *Satterfield*'s requirement that the alternate lawful means of discovery be actively underway before a constitutional violation occurs applies when that alternate means is a search warrant. *Watkins*, 13 F.4th at 1215.

In this case, because there is no evidence that SA Morris or one of the other agents at the scene of Mr. Contreras's arrest had begun the process of applying for a warrant to search the contents of Mr. Contreras's iPhone before agents violated Mr. Contreras's rights under the Fourth Amendment (and Fifth Amendment), the exclusionary rule prevents the government from introducing at trial the contents of Mr. Contreras's iPhone. Therefore, the Court sustains Mr. Contreras's objection to the applicability of the inevitable discovery doctrine.[21]

## IV.

Accordingly, the Court adopts in part and overrules in part Judge Johnson's report. The Court grants Mr. Contreras's motion to suppress.

The Clerk of Court shall please TERM Doc. 82 and Doc. 105.

---

[21] After Judge Johnson issued his report, the Eleventh Circuit issued a decision in *United States v. Morgan*, No. 23-11114, 2025 WL 1911585 (11th Cir. July 11, 2025). As the government conceded on the record during the July 29 hearing, (Doc. 136, p. 40), *Morgan* does not apply unless consent was voluntary – and it was not.

**DONE** and **ORDERED** this November 26, 2025.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE